**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

TURNPIKE FORD, INC.,

                 Plaintiff,

v.                                 CIVIL ACTION NO.  2:05-cv-00398

FORD MOTOR COMPANY and
FORD MOTOR CREDIT COMPANY,

                 Defendants.

**MEMORANDUM OPINION AND ORDER**

      Pending before the court are Ford Motor Company's ("Ford Motor") motion for summary judgment [Docket 149] and Ford Motor Credit Company's ("Ford Credit") motion for summary judgment [Docket 141].  Also pending before the court are Ford Credit's motion for a hearing [Docket 143]; Ford Motor's motion for a hearing [Docket 150]; Ford Motor's motion to exceed page limit for reply [Docket 166]; Turnpike Ford, Incorporated's ("Turnpike") motion for leave to file a surreply to Ford Credit's motion for summary judgment [Docket 153]; Turnpike's motion to exceed page limit for opposition to Ford Motor's motion for summary judgment [Docket 156]; and Turnpike's motion for leave to file a surreply to Ford Motor's motion for summary judgment [Docket 171].  For good cause shown, the motions to exceed the page limitations are **GRANTED,** Turnpike's motions for leave to file surreplies are **GRANTED,** and the defendants' motions for a hearing are **DENIED**. For reasons explained herein, the court **GRANTS** Ford Credit's motion for summary judgment and **GRANTS in part** and **DENIES in part** Ford Motor's motion for summary judgment.

**I. Background**

The plaintiff in this suit, Turnpike, is a Ford dealership located in Marmet, West Virginia. Turnpike is located in an area known to the parties as the Charleston Multiple Point ("Charleston MP"), which encompasses the Charleston, West Virginia, metropolitan area. Turnpike shares the area with two other Ford dealers: Bert Wolfe, located in Charleston and Moses, located in St. Albans. (Compl. ¶¶ 11-13.) Turnpike alleges that Ford Motor "has clearly expressed its preference for Turnpike's competitors" and "has clearly manifested its intent to reduce the number of dealerships in the Charleston Area from 3 to 2." (Turnpike's Opp'n Ford Motor's Mot. Summ. J. 1.) According to Turnpike, the impetus of Ford Motor's displeasure with Turnpike was Turnpike's "$49 over invoice" sales program. (*Id*. at 1-2.) Under the program, Turnpike experienced substantial growth in sales and became the top retail Ford dealer in West Virginia. (*Id*. at 2.) In order to sustain the program, however, Turnpike was required to sell a large number of vehicles at a lower profit margin per vehicle. (*Id*.) According to Turnpike, both Ford Motor and other Ford dealers in the area disliked the program and felt it was detrimental to the brand. (*Id*.) Turnpike alleges that, as a result of Ford Motor's long-term vision to eliminate Turnpike from the market and its displeasure with Turnpike's sales program, Ford Motor took steps to decrease Turnpike's allocation of vehicles to a point where Turnpike could no longer support the volume-based "$49 over invoice" sales program. (*Id*. at 2, 7-8.) Ford Motor also allegedly excluded Turnpike from lucrative off-site tent sales. (*Id*. at 8.)

In order to properly frame Turnpike's claims, a review of the various terms used by the parties is helpful. In this case, the terms in question generally address designated areas of land and the rights that correspond to those designated areas. Smaller cities, having only one Ford dealer, are

-2-

designated as "single points," while larger, urban areas served by multiple dealers are known as "multiple points." (Ford Motor's Reply Summ. J. 8.) The three dealers in Charleston–Turnpike, Bert Wolfe and Moses–share both the responsibility and the right to sell cars in this area. (*Id*.) In order to evaluate the sales of each dealer in the multiple point, Ford Motor apportions the Charleston MP into smaller areas, known as Primary Market Areas ("PMAs"), and assigns each dealer a PMA. (*Id*.) A dealer's PMA consists of a grouping of census tracts surrounding a dealer's location and is used "as the basis for determining dealer Shares of Responsibility and Planning Volumes." (Compl. ¶ 16.) That is, PMA allows Ford Motor to establish a sales goal for each dealer and track that dealer's sales in comparison to other dealers in the area. Ford Motor assigns a dealer's PMA based on multiple variables: the proximity of census tracts to the dealer; natural and man-made barriers affecting the movement of customers; traffic-flow patterns; and past selling patterns of the Ford dealers in the area. (*Id*. ¶ 16.)

The Sales and Service Agreement ("Agreement"), entered into between Ford Motor and Turnpike on June 3, 1974, designates an area known as "Dealer's Locality." Turnpike's Dealer Locality is the entire Charleston metropolitan area. (A. Parson's Dep. 211:22-212:6, Apr. 23, 2007, Ex. D, Ford Motor's Reply Summ. J; *see also* Compl. Ex. C.) Dealer's Locality is defined as "the locality designated in writing to the Dealer by the Company from time to time as the area of the Dealer's sales and service responsibility for COMPANY PRODUCTS." (Ford Sales & Service Agreement ¶ 1(j), Compl. Ex. A [Docket 1].) Under the section titled "Determination of Dealer Representation," Ford Motor retains the right to determine "the numbers, locations and sizes of authorized dealers necessary for proper and satisfactory sales and service representation . . . within and without the DEALER'S LOCALITY." (*Id*. at ¶ 9(a).) Ford Motor must, however, "inform the

-3-

Dealer of any proposed change in the Company's market representation plans for the DEALER'S LOCALITY. . . ." (*Id*. at ¶ 9(b).)

Finally, the West Virginia Motor Vehicle Dealers, Distributors, Wholesalers, and Manufacturers Act ("WV Dealers Act"), W. Va. Code §§ 17A-6A-1 to -18, defines Relevant Market Area as the area located within a fifteen air-mile radius[1] around an existing same line-make new motor vehicle dealership. *See* W. Va. Code § 17A-6A-3(14). Under the WV Dealers Act, a manufacturer may not "[e]stablish a new motor vehicle dealership which would unfairly compete with a new motor vehicle dealer of the same line-make operating under a dealer agreement with the manufacturer or distributor in the relevant market area." *Id.* § 17A-6A-10(2)(h).

In its first claim in Count One of the Complaint, Turnpike alleges that Ford Motor breached the Agreement by changing Turnpike's PMA in 1996 without performing a market study or notifying Turnpike of the change until May 10, 2002. (Compl. ¶¶ 59–67.) The change in Turnpike's PMA eliminated an area including Route 119, or Corridor G, in which a number of retail sales business are located. (*Id*. ¶ 17.) Because Turnpike believes a dealer's PMA directly affects inventory allocation, Turnpike alleges that Ford Motor caused it to lose a substantial percentage of its inventory allocation by changing its PMA. Consequently Turnpike lost sales and revenue. (*Id*. ¶ 22.)

Turnpike's other breach of contract claim against Ford Motor involves off-site sales events, or sales occurring at locations other than a dealer's physical location. Turnpike alleges that its Agreement with Ford Motor prohibits a dealer from conducting an off-site sale without the prior written consent of Ford Motor. (*Id*. ¶ 28.) Further, Turnpike contends that Guidelines established

---

[1] Relevant Market Area for any dealership in which the agreement between the dealer and manufacturer was executed after March 10, 2007 is twenty air-mile radius. *See* W. Va. Code § 17A-6A-3(14).

by Ford Motor require written approval of an off-site sale by any dealer in whose PMA the sale is to be conducted. (*Id*. ¶ 29.)  Turnpike claims that Ford Motor assisted other area dealers, notably Bert Wolfe and Moses, in planning and operating multiple off-site tent sales within Turnpike's PMA without Turnpike's approval, in breach of its contract.  (*Id*. ¶ 65.)

Count Two claims that Ford Motor and Ford Credit violated the Automobile Dealers' Day in Court Act ("ADDCA"), 15 U.S.C. §§ 1221–1226.  (*Id*. ¶¶ 68–73.)  Turnpike alleges that Ford Motor and Ford Credit failed to act in good faith and cites the following as proof of the ADDCA violations: (1) Ford Motor's manipulation of Turnpike's inventory by eliminating portions of Turnpike's PMA without notice;  and (2) Ford Motor and Ford Credit's improper assistance of Bert Wolfe and Moses in holding multiple "Ford Tent Sales" within Turnpike's designated PMA without receiving Turnpike's written consent.  (*Id*. ¶¶ 70–72.)

Count Three alleges that Ford Motor and Ford Credit violated the West Virginia Motor Vehicle Dealers, Distributors, Wholesalers, and Manufacturers Act ("WV Dealers Act"), W. Va. Code §§ 17A-6A-1 to -18.  (*Id*. ¶¶ 74–80.)  Turnpike claims that the same conduct that violated the ADDCA also violated the WV Dealers Act.  (*Id*. ¶¶ 75–77.)

## II. Standard of Review

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, the court will draw any permissible inference from the underlying facts in the light most

favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III. Discussion

### A. Count 1: Breach of Contract–Changes in Primary Market Area

Turnpike alleges that the Agreement required Ford Motor to perform a market study and to provide written notice to Turnpike before redesignating Turnpike's PMA, and that Ford Motor failed to take these actions. As a result of this breach, Turnpike alleges that it lost a substantial percentage of its inventory allocation, which subsequently resulted in lost sales and revenue. Ascertaining Turnpike's grounds for asserting a claim based on Ford Motor's change of its PMA has proven challenging. Turnpike concedes that the term "PMA" does not appear in the Agreement, but argues that the term is either "part of," or a "sub-part of," or synonymous with, the phrase "Dealer's Locality," which does appear in the Agreement. (Turnpike's Opp'n Ford Motor's Mot. Summ. J. 7, 24.) Additionally, Turnpike asserts that Ford Motor's expert "has admitted that the PMA is part of the dealer's locality." (*Id.* at 7.) Turnpike states that "[t]he [Agreement] requires notification of

any change to a dealer's locality, and . . . PMA is part of the dealer's locality." (*Id*.) Ford Motor disputes the fact that it redesignated Turnpike's PMA, but argues that even if it did, the Agreement does not restrict its right to change Turnpike's PMA. (Ford Motor's Reply Summ. J. 9.) Ford Motor explains that Turnpike's Dealer Locality is the entire Charleston metropolitan area, which also includes Bert Wolfe and Moses, while PMA is a dealer-specific area. (*Id*. at 8-10.) Ford Motor asserts that Turnpike has confused PMA, which is not mentioned in the Agreement, with Dealer's Locality, which is a contractual term. (*Id*. at 10.)

"Contract interpretation is a subject particularly suited for summary judgment." *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 835 (4th Cir. 1999). Only an unambiguous written instrument, which expresses the intent of the parties in plain and unambiguous language justifies summary judgment. An unambiguous contract is not subject to judicial construction or interpretation, but will be applied and enforced as written. *Billiter v. Melton Truck Lines, Inc.*, 420 S.E.2d 286, 290 (W. Va. 1992). "The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face." *C & O Motors, Inc. v. General Motors Corp.*, No. 2:05-cv-835, 2006 WL 3487648, at *4 (S.D. W. Va. Dec. 1, 2006).

The question of whether a contractual provision is ambiguous is one of law for the court. *Berkeley County Pub. Serv. Dist. v. Vitro Corp. of Am.*, 162 S.E.2d 189, 191 (W. Va. 1968). "The term 'ambiguity' is defined as language reasonably susceptible of two different meanings or language of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning." *Provident Life & Accident Ins. Co. v. Berry*, No. 2:06-cv-00945, 2007 WL 4170187, at *5 (S.D. W. Va. Nov. 21, 2007). The language of a contract "must be considered and construed as

a whole, giving effect, if possible, to all parts of the instrument." *Moore v. Johnson Serv. Co.*, 219

S.E.2d 315, 317 (W. Va. 1975). A contract is not ambiguous merely because the parties disagree

as to the meaning of the language they used to express their agreement. *Tri-State Asphalt Prods.,*

*Inc. v. Dravo Corp.*, 412 S.E.2d 225, 230 (W. Va. 1991). "If a court properly determines that the

contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a

matter of law and grant summary judgment because no interpretive facts are in genuine issue." *C*

*& O Motors,* 2006 WL 3487648, at *4.

     If the matter in controversy is not clearly expressed and the court determines as a matter of

law that the contract is ambiguous, "[e]xtrinsic evidence may be used to aid in the construction of

a contract." *Berkeley County Pub. Serv. Dist*, 162 S.E.2d at 191. When the extrinsic evidence is

dispositive of the interpretive issue, summary judgment may be granted. *C & O Motors,* 2006 WL

3487648, at *4. "If, however, resort to extrinsic evidence in the summary judgment materials leaves

genuine issues of fact respecting the contract's proper interpretation, summary judgment must of

course be refused and interpretation left to the trier of fact." *Id*.

     With these principles in mind, the court turns to the Agreement to begin its analysis. The

term Primary Market Area appears nowhere in the Agreement. It is neither a defined term, nor does

it appear in the body of the Agreement. The Agreement is unambiguous on its face, in that term

PMA is not mentioned. The Agreement conveys no rights or obligations to either party regarding

PMA. In arguing that its rights regarding Dealer's Locality extend to the term PMA, Turnpike

essentially attempts to insert an ambiguity into the Agreement. The court finds this argument

unconvincing based on a plain reading of the Agreement.

Turnpike appears to argue that because both PMA and Dealer's Locality require some consideration of the area surrounding a dealer, and because the terms are related, any change to PMA should merit the same notice that is provided for Dealer's Locality. While Turnpike is correct that certain similarities and connections may exist in regard to the two terms–both areas are assigned based on census tracts and the area designated as Dealer's Locality will include the area designated as the dealer's PMA–the fact remains that the terms identify different areas.

Dealer's Locality, as used in the Agreement, is an area which may include multiple dealers and is not an area solely designated to Turnpike. Ford Motor is required to designate in writing to Turnpike the "area of the Dealer's sales and service responsibility," or its "Dealer Locality." (Ford Sales & Service Agreement ¶¶ 1(o), 9(a), Compl. Ex. A.) Ford Motor retains the right to alter the total number of dealers, their location and size within this area. (*See id.* ¶ 9(a).) When making a change to this area, however, Ford Motor must provide Turnpike written notice. (*Id.* at 9(b).) Additionally, Ford Motor is given "the right to appoint additional dealers in VEHICLES within or without the DEALER'S LOCALITY," but if an additional dealer is within the Dealer's Locality or within 10 miles of the Dealer's principal place of business, Ford Motor must first conduct a market study and provide notice to the Dealer. (*Id.* at ¶ 9(c).) Based on the above language the term "Dealer's Locality" is an area which may include multiple dealers.

In comparison, PMAs are distinct areas occupied by only one dealer. PMAs are assigned to each dealer and consist of groupings of census tracts exclusive to that dealer. (*See* Comp. ¶ 16; *see also* Turnpike's Opp'n Ford Motor's Mot. Summ. J. 1 ("Ford assigned each dealer a territory or Primary Market Area ("PMA") within the [Charleston Multiple Point] in which that dealer has

responsibility for sales and services.").) Ford Motor's expert, which Turnpike argues "admitted that the PMA is part of the dealer's locality," confirmed this distinction:

> The dealer locality at issue in this case is the Charleston, West Virginia Multiple Point Market ("Charleston MP"), which currently includes three Ford dealers – Bert Wolfe Ford, Inc., Moses Ford, Inc., and Turnpike Ford, Inc.

> Ford defines further sub-areas within the dealer locality by census tracts, which Ford terms primary market areas or PMAs. Each dealer in the MP is assigned a PMA.

(Farhat Decl. ¶¶ 5-6, Attach. 2, Ford Motor's Mot. To Seal [Docket 151].) The distinction between Dealer's Locality and PMA is necessary because the parties use each term for different reasons. Dealer's Locality defines the rights of Turnpike and Ford Motor with regard to the number of dealers, their locations and sizes, in a defined area, whereas PMA is used to establish a sales goal for each dealer and to track that dealer's sales in comparison with other dealers in the area.

Turnpike also points out that because a Dealer's Locality is defined as "the area of the Dealer's sales and service responsibility" for Ford Motor products, and because PMA establishes the Dealer's percent or share of responsibility, any change in the PMA should be considered a change in Dealer Locality. (Turnpike's Opp'n Ford Motor's Mot. Summ. J. 23-25.) A dealer is assigned both a Dealer's Locality and a Percentage or Share of Responsibility which is the "sales requirement that a multiple point dealer must meet, which is calculated based on the vehicles that a dealer is expected to sell." (Ford Motor's Reply Summ. J. 8 n.3.) Turnpike also submits with its Complaint a letter titled "Designation of Dealer's Locality" which "designate[s] the communities detailed on the attached schedule as your DEALER'S LOCALITY." (Compl. Ex. C.) The letter also designates the dealer's Percent Responsibility: "pursuant to subparagraph 1(o) and until further notice, your PERCENT RESPONSIBILITY for such DEALER'S LOCALITY for CARS and for

-10-

TRUCKS is likewise detailed on the attached schedule."  (*Id*.) The schedule indicates that Turnpike's percentage responsibility for cars is 17.70 percent, and 15.93 for Trucks. (*Id*.)  Turnpike essentially invites the court to conclude that this connection between Dealer's Locality, PMA, and Percent Responsibility is sufficient to extend the right of notice for changes to its Dealer's Locality to changes to PMA.  These arguments have little merit.  I **FIND** that the Agreement unambiguously places no obligation on Ford Motor to conduct a market survey or provide Turnpike notice prior to changing Turnpike's PMA. Turnpike's attempt to extend its rights under the Agreement by either suggesting a relationship between PMA and Dealer's Locality or inserting an ambiguity into the Agreement is inconsistent with the plain and unambiguous language of the contract and ignores the very different nature and purpose of the two terms.

Accordingly, the court **FINDS** that as a matter of law, any change in Turnpike's PMA was not a breach of the Agreement between Turnpike and Ford Motor.

### B. Count 1: Breach of Contract–Tent Sales

Turnpike further alleges that Ford Motor breached the Agreement by approving and assisting other Ford dealerships, namely Bert Wolfe and Moses, in planning and operating four off-site "Ford Tent Sales" between June 2001 and June 2002 without the approval of Turnpike.  (Compl. ¶¶ 37, 44, 50, 56, 65.) Two of these tent sales occurred on the premises of Tri-State Racetrack, located in Nitro, West Virginia (*Id*. at ¶ 33.); one occurred on the premises of the South Ridge Center, located in the Corridor G area of South Charleston, West Virginia (*Id*. at ¶ 41.); and one occurred on the premises of Laidley Field, located in Charleston, West Virginia (*Id*. at ¶ 54.).

Turnpike maintains that the Agreement, specifically section 5(c), prohibits another dealer from establishing or operating an off-site sale without the prior written consent of Ford Motor.  (*Id*.

¶ 28.)  Section 5(c) directs that the Dealer may not "directly or indirectly establish or operate in whole or in part any other locations or facilities for the sale or service of COMPANY PRODUCTS or the sale of used vehicles without the prior written consent of the Company."   (Ford Sales & Service Agreement ¶ 5(c), Compl. Ex. A.)  Turnpike cites a letter from Ford Motor regarding "Guidelines for Conducting Off-Site Sale or Display Events," which "outline Company Policy per [Section 5(c) of the Agreement]." (Compl. ¶ 29, Ex. E.)  The Guideline states:

> The location of the event should be in the dealer's Primary Market Area (PMA) . . . , or if it is not, should be approved in writing by the dealer in whose primary PMA the event is located.
>
> . . .
>
> Without written approval by the dealer in whose PMA the event is located, Company approval for other Ford dealer's participation cannot be granted.

(*Id.* Ex. E.)  Turnpike does not argue that 5(c) of the Agreement was breached, i.e. that another dealer established a location without the consent of Ford Motor.  Instead, Turnpike asserts that "Sections 5(b) and (c) of the [Agreement], read in conjunction with [Ford Motor's] Guidelines for conducting Off-Site Sales or Display Events, prohibits Ford [Motor] from approving an off-site tent sale held by other dealers in Turnpike's PMA without Turnpike's written consent." (Turnpike's Opp'n Ford Motor's Mot. Summ. J. 29.)

Under the terms of the Guidelines, the tent-sales must have occurred in Turnpike's PMA in order for Turnpike to have a breach of contract claim.  For each of the offending tent-sales, however, Turnpike only alleges that the sale occurred in its *Relevant Market Area*.  For example, Turnpike asserts that the June 2002 tent-sale occurring at Laidley Field "was in Turnpike's relevant market area."  (*Id.* at 11-12.) Relevant Market Area is defined in the WV Dealer's Act. *See* W. Va. Code § 17A-6A-3(14).  While the WV Dealers Act limits the ability of a manufacturer to establish a new

motor vehicle dealership in this area, *see* W.Va. Code  § 17A-6A-10(2)(h), the Guidelines do not address Relevant Market Area, much less mention Relevant Market Area in the context of outlining a dealer's obligation to other dealers in conducting tent sales.

Further, Turnpike admits that some sales occurred in an area *not* located in its PMA. Turnpike states that the Tri-State Greyhound Race Track "was not located in Turnpike's PMA," but argues that the area "was clearly within Turnpike's relevant market area under W. Va. Code § 17A-6A-3." (Turnpike's Opp'n Ford Motor's Mot. Summ. J. 9.)  Similarly, Turnpike contends that the South Ridge Center in Corridor G, in which the August 2001 tent-sale occurred, "*was* in Census Tract 123 of Turnpike's original PMA." (*Id*. at 10 (emphasis added).)  Turnpike alleges that Census Tract 123, which included the South Ridge Center, was removed from Turnpike's PMA sometime in or around 1996.  (Compl. ¶ 17.)  Thus the tent-sale in Corridor G at the South Ridge Center, which occurred in August 2001, did not occur at a time when the area was included in Turnpike's PMA.[2]  Turnpike's allegation that the tent-sales occurred in its Relevant Market Area do not allege a harm recognized under the Guidelines.  Further, Turnpike fails to allege that the offending tent-sales occurred within its PMA.

Even if Turnpike had alleged the tent-sales occurred in its PMA, the Agreement does not require that Ford Motor obtain Turnpike's permission prior to authorizing other dealers' tent-sales occurring in Turnpike's PMA.  I find that the terms of the Agreement are unambiguous; Section 5(c) of the Agreement only prohibits a *dealer* from conducting an off-site tent-sale without Ford Motor's

---

[2] Turnpike argues that Ford Motor breached the Agreement even though Census Tract 123 was not in its PMA because Ford Motor had previously breached its duty to provide notice and a market study before removing the tract from Turnpike's PMA.  I have already found that any change to Turnpike's PMA was not a breach of the Agreement. Accordingly, Turnpike's argument fails and a breach of the Agreement could only have occurred if the tent-sale occurred in Turnpike's PMA.

permission. The Guidelines create no duties or rights for either party. At most, they are a statement of Ford Motor's policy. In the absence of a contractual ambiguity, the court is confined to the four-corners of the parties' Agreement, and Turnpike does not allege that Bert Wolfe or Moses failed to obtain Ford Motor's permission prior to conducting these tent-sales. I **FIND** that Ford Motor did not breach the Agreement in approving four off-site tent-sales without the approval of Turnpike. Accordingly, the court **GRANTS** Ford Motor's motion for summary judgment as to Count I.

### C. Count 2: Violation of the Automobile Dealers' Day in Court Act

Turnpike alleges that both Ford Motor and Ford Credit failed to act in good faith in violation of the Automobile Dealers' Day in Court Act ("ADDCA"), 15 U.S.C. §§1221-1225. Specifically, Turnpike asserts that Ford Motor violated the ADDCA by manipulating Turnpike's inventory allocation by eliminating part of Turnpike's PMA and by improperly authorizing and assisting other dealers in conducting tent-sales. Turnpike alleges that Ford Credit improperly authorized and assisted Bert Wolfe and Moses in conducting off-site tent-sales within Turnpike's PMA without Turnpike's written approval.

Under the ADDCA, a dealer may bring suit when the manufacturer fails "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise." 15 U.S.C. § 1222. Good faith is "the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party." 15 U.S.C. § 1221(e). Good faith under the ADDCA is more limited than the general good faith standard, and requires that the manufacturer's actions rise to actual or threatened coercion or intimidation. *David R. McGeorge Car Co. v. Leyland*

-14-

*Motor Sales, Inc.*, 504 F.2d 52, 55-56 (4th Cir. 1974). "Mere 'discriminatory allocation, without the concomitant of coercion, does not constitute conduct proscribed by the Act.'" *Colonial Dodge, Inc. v. Chrysler Corp.*, 11 F. Supp. 2d 737, 743 (D. Md. 1996) (quoting *Ed Houser Enters. v. General Motors Corp.*, 595 F.2d 366, 371 (7th Cir. 1978)). Coercion or intimidation must include a wrongful demand which, if not complied with, will result in sanctions. *Id.* While "recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith," 15 U.S.C. § 1221(e), "[t]he existence of coercion or intimidation depends upon the circumstances arising in each particular case and may be inferred from a course of conduct." *David R. McGeorge Car Co.*, 504 F.2d at n.7 (quoting H. Rep. No. 2850, 84th cong., 2d Sess. 9, at 4596, 4603 (1956)).

Ford Motor asserts that Turnpike's ADDCA claim fails as a matter of law because "Turnpike fails to allege, much less support, a wrongful demand with a threat of sanctions." (Ford Motor's Mem. Mot. Summ. J. 12.) Ford Motor argues that although Turnpike alleges Ford Motor changed Turnpike's PMA sometime in 1996, Turnpike also asserts that it had no knowledge of that change until May 10, 2002. Ford Motor contends that no coercion, intimidation, or threats could have existed if Turnpike was unaware of the change to its PMA. Turnpike argues that the question of good faith is a factual determination properly left to the jury and that "a fact-finder could reasonably determine from the evidence documenting Turnpike's ongoing relationship with Ford [Motor] that Ford [Motor] acted coercively to essentially eliminate Turnpike's PMA and reduce the number of Ford dealerships in the [Charleston MP] from three to two." (Turnpike's Opp'n Ford Motor's Mot. Summ. J. 28-29.) According to Turnpike, Ford Motor wanted Turnpike to terminate the "$49 over invoice" sales program. (*Id.* at 2.) Turnpike alleges that its "sales program was not well-received

-15-

. . . by Ford [Motor]" and that Ford Motor "expressed its dissatisfaction with the program . . . and its desire that Turnpike terminate the program." (*Id*.)   Turnpike further alleges that it was forced to terminate the program in 1998 because its allocation of vehicles had declined and it was unable to support the volume based program.  (*Id*.)  As to the "$49 over invoice sales program," Turnpike's claims simply allege that Ford Motor attempted to persuade or urge them to terminate the program. Turnpike does not allege that Ford Motor demanded it to discontinue the sales program or accompanied that demand with a threat of sanctions for noncompliance.  Turnpike alleges two types of sanctions: Ford Motor's changes to Turnpike's PMA and approval of other dealers' tent-sales. The former occurred without Turnpike's knowledge, while the latter occurred *after* Turnpike terminated the sales program.  As such, Turnpike fails to allege or establish that Ford Motor made a wrongful demand accompanied by the threat of sanctions for noncompliance.

Turnpike's claims against Ford Credit fail for similar reasons.[3]  Turnpike alleges that it "was treated differently than Bert Wolfe Ford and Moses Ford" and that Ford Credit's on-site presence at the tent sales to "aggressively approve and purchase retail finance contracts, provide promotional rate concessions, assistance with registration and allocation of customers to dealers Bert Wolfe and Moses, and payment for door prizes and meals to managers" constituted "intimidating conduct" towards Turnpike. (Turnpike's Opp'n Ford Credit's Mot. Summ. J. 18-19.) Again, discriminatory actions, without concomitant coercion, are not proscribed by the ADDCA.  Turnpike's allegations that it was "treated differently" do not give rise to a claim under the ADDCA unless accompanied

_____

[3] The parties dispute whether Ford Credit can be held liable under the ADDCA.  This court addressed the issue in a previous memorandum opinion and order [Docket 35].  The court need not address the parties' arguments because it finds that even if Ford Credit could be held liable under the ADDCA, Turnpike has failed to allege a cause of action.

by coercive behavior.  Turnpike fails to allege that Ford Credit made any demand of it or that it accompanied that demand with the threat of sanctions.

For the reasons stated above, the court **FINDS** that the plaintiff's ADDCA claims fail as a matter of law. Accordingly, the court **GRANTS** Ford Motor and Ford Credit's motions for summary judgment as to Count II.

*D. Count 3: Violation of the West Virginia Motor Vehicle Dealers, Distributors, Wholesalers and Manufacturers Act*

Turnpike also contends that Ford Motor violated the West Virginia Motor Vehicle Dealers, Distributors, Wholesalers and Manufacturers Act ("WV Dealers Act"), W. Va. Code § 17A-6A-1 to -18, when it violated the Agreement by eliminating a portion of Turnpike's PMA without notice or a market study and by failing to deliver new motor vehicles within a reasonable time and in reasonable quantities.  Turnpike also argues that Ford Motor and Ford Credit violated the WV Dealers Act by improperly authorizing and assisting other dealers in off-site tent sales and by failing to act in good faith.  The Act creates a cause of action for a dealer and permits the dealer to recover actual damages, treble damages and reasonable attorneys' fees when the manufacturer "commits any other violation of this article."  *See* W. Va. Code § 17A-6A-16(A). Turnpike asserts that Ford Motor and Ford Credit committed a number of violations of the WV Dealers Act.  The court will consider each below.

1.  Ford Motor: Section 17A-6A-10(2)(s)

Turnpike maintains that Ford Motor violated West Virginia Code § 17A-6A-10(2)(s) by eliminating a portion of Turnpike's PMA without conducting a market study or providing notice to Turnpike as required by the Agreement.  Section 17A-6A-10(2)(s) provides that a manufacturer may not "[m]ake any material change in any franchise agreement without giving the new motor vehicle

-17-

dealer written notice by certified mail of the change at least sixty days prior to the effective date of the change." I have already determined that Turnpike's PMA was not contractually guaranteed under the Agreement. A change to Turnpike's PMA is not a "material change" to the Agreement and, as such, no notice is necessary under § 17A-6A-10(2).

### 2. Ford Motor: Section 17A-6A-10(2)(a)

Turnpike also argues that Ford Motor violated West Virginia Code § 17A-6A-10(2)(a) by failing to deliver vehicles within a reasonable time and in reasonable quantities. Section 17A-6A-10(2)(a) states that a manufacturer may not "[f]ail to deliver new motor vehicles . . . within a reasonable time and in reasonable quantities relative to the new motor vehicle dealer's market area and facilities." Turnpike alleges that Ford Motor's allocation process was not "fair and reasonable." (Turnpike's Opp'n Ford Motor's Mot. Summ. J. 19.) Turnpike submits the testimony of its President, Vice President, and Sales Managers, who testified that Turnpike's allocation of vehicles was unreasonable and had declined to such a point that Turnpike could no longer support the $49 over invoice sales program. (*Id*. at 16.) In support of their assertion, Turnpike offers evidence that shipments of vehicles from Ford Motor declined 19.1 percent from 1996 to 1997 and 19.6 percent from 1997 to 1998. (Turnpike's Surreply to Ford Motor's Mot. Summ. J. 3-4 [Docket 171].) Ford Motor insists that Turnpike received reasonable allocations (Ford Motor's Reply 13-16), and offers the fact that Turnpike did not order all of the vehicles offered by Ford Motor and that Turnpike had more days supply of inventory than other Charleston Ford dealers in almost every year since 1997 (Ford Motor's Mot. Summ. J. 12-13). Additionally, Ford Motor offers the testimony of Ford Motor employees stating that Ford Motor's automated allocation process was uniformly applied to every

-18-

dealer. (*Id*. at 13.) Whether Ford Motor's conduct was reasonable under Section 17A-6A-10(2)(a) is a question of fact to be resolved by the jury.  *See C & O Motors,* 2006 WL 3487648, at *12.

3.  Ford Motor & Ford Credit: Good Faith and/or Section 17A-6A-10(2)(e)

Turnpike alleges that Ford Motor and Ford Credit violated the WV Dealers Act by "failing to act in good faith in performing and complying with the terms and provisions of the Agreement." (Compl. ¶ 77.)  The WV Dealer's Act, unlike the ADDCA, does not create a cause of action for failure to act in good faith.  *See* W. Va. Code § 17A-6A-1, *et seq*.  Turnpike asserts that the Ford Motor and Ford Credit violated the Act "in its entirety."   (Turnpike's Opp'n Ford Motor's Mot. Summ. J. 25; Turnpike's Opp'n Ford Credit's Mot. Summ. J. 20.) In order to survive summary judgment, Turnpike must specify the sections of the Act giving rise to a cause of action. Turnpike submits, as an example of Ford Credit's and Ford Motor's violation of the entirety of the Act, that the defendants violated § 17A-6A-10(2)(e).  Turnpike suggests that the defendants violated that section by "providing inducements to some dealers (Bert Wolfe Ford and Moses Ford), while failing to provide them to other dealers (Turnpike)." (Turnpike's Opp'n Ford Credit's Mot. Summ. J. 20.) Turnpike misconstrues that section. Section 17A-6A-10(2)(e) prohibits manufacturers from offering "any refunds or other types of inducements to any dealer for the purchase of new motor vehicles . . . to be sold *to this state or any political subdivision of this state* without making the same offer available upon request to all other new motor vehicle dealers."  W. Va. Code § 17A-6A-10(2)(e) (emphasis added).  There is no evidence that Ford Motor and Ford Credit offered any refunds or inducements to other dealers for automobiles intended for sale to the State of West Virginia.  As a matter of law, Turnpike's allegation is insufficient to survive summary judgment.

-19-

### 4.  Ford Motor & Ford Credit: Section 17A-6A-10(2)(h)

Turnpike additionally contends that Ford Motor and Ford Credit violated West Virginia Code

§ 17A-6A-10(2)(h) by improperly authorizing and assisting Bert Wolfe and Moses in conducting

off-site tent-sales in Turnpike's relevant market area.  Section 17A-6A-10(2)(h) provides that a

manufacturer may not "[e]stablish a new motor vehicle dealership which would unfairly compete

with a new motor vehicle dealer of the same line-make operating under a dealer agreement with the

manufacturer or distributor in the relevant market area."  Turnpike's relevant market area is the area

located within fifteen air-mile radius around an existing same line-make new motor vehicle

dealership.  *See* W. Va. Code  § 17A-6A-3(14).

Turnpike's tent-sale claims under the WV Dealers Act are barred by the two year statute of

limitations established in West Virginia Code § 55-2-12.  The WV Dealers Act does not specify a

limitations period, however, this court, in *LaFon v. Gen. Motors Corp.*,  No. 2:03-cv-0325 (S.D. W.

Va. May 14, 2004), determined that the two-year limitations period applied to claims brought under

the Act.  *Id*. at 4.  The tent-sales giving rise to Turnpike's claims occurred on or about June 7-10,

2001; August 16-19, 2001; March 14-17, 2002; and June 27-30, 2002.  (Compl. ¶¶ 37, 44, 50, 56.)

Turnpike's Complaint was filed on May 9, 2005.  Accordingly, Turnpike's claims under the WV

Dealers Act are barred by the two-year statute of limitations unless they remain actionable under the

doctrine of equitable tolling.

Turnpike suggests that its WV Dealers Act claims should be equitably tolled because

Turnpike first sought review of its dispute with Ford Motor and Ford Credit regarding the tent sales

with the Dealer Policy Board.  (Turnpike's Surreply to Ford Motor's Mot. Summ. J. 5; Turnpike's

Opp'n Ford Credit's Mot. Summ. J. 15-17.)  Turnpike argues that under the Agreement between

Ford and Turnpike, Turnpike was required to raise all perceived violations of the Agreement with the Policy Board.  Turnpike suggests that it should not be penalized for attempting to resolve its dispute with Ford Motor and Ford Credit through Ford Motor's internal grievance procedures before seeking relief through the courts.

The court finds that proper circumstances do not exist to merit the use of equitable tolling. First, Ford Credit is not a party to the Agreement and, as such, Turnpike's equitable tolling argument, which relies on the internal grievance procedure established between Ford Motor and Turnpike, does not apply to Ford Credit.  Second, the Fourth Circuit has held that in situations where a plaintiff can pursue parallel avenues of relief, such as filing a claim with both an administrative agency and in federal court, equitable tolling is not appropriate.  *Kolomick v. United Steelworkers of Am., Dist. 8*, 762 F.2d 354, 356-57 (4th Cir. 1985); *see also Trent v. Bolger*, 837 F.2d 657, 659 (4th Cir. 1988).  Only in cases where a party is required to exhaust any remedy prior to seeking relief in court should the statute of limitations be equitably tolled.   *Kolomick*, 762 F.2d at 356-57.  The Agreement only required that Turnpike raise any complaints with the Board. It did not limit Turnpike's ability to file suit.

For the reasons stated above, the court **FINDS** Turnpike's claims under the WV Dealers Act, with the exception of its claim against Ford Motor under West Virginia Code § 17A-6A-10(2)(a), fail as a matter of law.  Accordingly, the court **GRANTS** Ford Credit's motion for summary judgment as to Count III, and **GRANTS in part** and **DENIES in part** Ford Motor's motion for summary judgment as to Count III.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        January 31, 2008

Joseph R. Goodwin, Chief Judge

-22-